UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

James E. Curtis,

                    Plaintiff,                          Court File No. 16-cv-4269 (SRN/LIB)

        v.                                              **REPORT AND RECOMMENDATION**

Jeff Gutzmer,

                    Defendant.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636, and upon Defendant Jeff Gutzmer's ("Defendant")[1] Motion to Dismiss. [Docket No. 12]. The Court took Defendants' motion under advisement on the written submissions.

For the reasons discussed herein, the Court recommends that Defendant's Motion to Dismiss, [Docket No. 12], be **GRANTED**.

## I.    BACKGROUND AND STATEMENT OF RELEVANT FACTS[2]

Plaintiff James E. Curtis ("Plaintiff") is currently confined within the Washington Department of Corrections. (Compl., [Docket No. 1], at 4).[3] Beginning in 2000, Plaintiff began writing articles criticizing the Washington Department of Corrections, and its employees, which were published in various outlets and gained some media attention. (Id. at 5). At some point after

---

[1] Defendant Gutzmer is a Lieutenant at the Minnesota Correctional Facility—Oak Park Heights. (Compl., [Docket No. 1], at 4). Defendant is the only Defendant in the present case.

[2] For the purposes of the present motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the Complaint as true and construes them in the light most favorable to Plaintiff. See, Stodghill v. Wellston Sch. Dist., 512 F.3d 472, 476 (8th Cir. 2008).

[3] Plaintiff's Complaint, [Docket No. 1], is sixty-three pages in length with paragraphs ranging from A through H.H.H.H.H.H.H.H.H.H.H.H.H.H.H.H.H. Accordingly, for ease of reference when the Court cites to the Complaint, [Docket No. 1], it cites to the page number assigned to the Complaint on CM/ECF. Attached to the Complaint are almost 400 pages of nonconsecutively paginated exhibits which the Court will also refer to by CM/ECF docket number and CM/ECF page number.

Plaintiff began writing articles he alleges that the "WDOC's Security Threat Group . . . instituted a convert counter-intelligence program" against him, and the group initiated criminal charges against him with allegedly fabricated evidence. (Id.). In response to those charges, Plaintiff, on February 19, 2008, filed a suit against the "WDOC's Security Threat Group" coordinator, William Riley. (Id. at 7).

On March 10, 2009, Plaintiff was placed in "solitary confinement (i.e., in the Intensive Management Unit (IMU))" where he remained until June 9, 2009. (Id. at 8). While in solitary confinement, Plaintiff alleges he received various mistreatments including having his food poisoned and having his bed, cell, and drinking cup contaminated. (Id.).

Plaintiff was transferred inside the state of Washington on at least five more occasions, and he remained in solitary confinement throughout those transfers. (Id. at 8–10). Plaintiff alleges he continued to suffer the same mistreatment as he had previously suffered in solitary confinement. (Id.).

On September 20, 2012, Plaintiff was transferred under the Interstate Corrections Compact to the State of Minnesota, and he was admitted into the custody of the Minnesota Department of Corrections. (Id. at 11). Plaintiff was housed in St. Cloud, Minnesota. (Id.). Upon arrival, Plaintiff alleges he received at least two veiled threats through song lyrics from two different guards, and a guard placed Plaintiff at the top of the stairs in hand cuffs and warned him "not to have an accident and fall down the stairs." (Id.).

On January 4, 2013, Plaintiff was transferred to Minnesota Correctional Facility— Stillwater. (Id. at 13). On January 10, 2014, Plaintiff was housed in segregation for alleged violations of various regulations. (Id.). On January 14, 2014, Plaintiff pled guilty to disorderly conduct and fighting, and he received 15 days in disciplinary segregation. (Id.).

In June 2014, Plaintiff received an issue of Prison Legal News through the mail which he allegedly did not order, and he "became the target of racially-charged rumors," which all lead Plaintiff to believe he was still "on the radar" of "William Riley (WDOC's STG Coordinator)." (Id. at 13–14).

In 2014, Plaintiff pled guilty to misconduct violations on three more occasions, and each time he was placed in segregation. (Id. at 14–16). Upon returning to segregation, he observed that the cell had not been cleaned but it did appear to have been sprayed with some chemical. (Id.). Once released from segregation, Plaintiff's cell "contained fecal/urinary water an inch deep across the entire floor." (Id. at 15–16). While in segregation, Plaintiff wrote Stillwater's Warden, Ms. Michelle Smith, to request a "fresh start: transfer to Oak Park Heights. (Id. at 16). That requested was granted, and on October 10, 2014, Plaintiff was transferred to Oak Park Heights. (Id.).

Upon his arrival to Oak Park Heights, Plaintiff was housed in the Administrative Control Unit. Plaintiff alleges that the cell was contaminated with a "repugnant chemical order" before his arrival. (Id.). Plaintiff noticed the same smell on the milk he was brought daily and the blankets he was provided. (Id.). Between October 10, 2014, and December 27, 2014, Plaintiff alleges his cell and blankets were contaminated "by ACU staff" with malodorants, including an incident on December 13, 2014, when Officers Trista Shields, David Hatch, and John Ricci allegedly entered Plaintiff's cell to contaminate the blankets with a "malodorant akin to rotting flesh," and at least three separate occasions when Plaintiff digested food which made him sick. (Id. at 18–20, 24).

At some point between October 10, 2014, and October 27, 2014, Plaintiff talked with Defendant Gutzmer about Plaintiff's desire to do good and eventual be housed in the "honor

unit" after his release from segregation. (Id. at 17). Defendant Gutzmer instructed Plaintiff to write his case manager about how to get into the honor unit given Plaintiff's disciplinary history. (Id.). The two did not discuss transfer out of Minnesota.

On December 4, 2014, Plaintiff sent Defendant Gutzmer a kite informing him that Plaintiff had legal issues that needed addressing in Washington State and requesting that Defendant ask staff to provided Plaintiff with the "internet-generate court opinions he would be receiving in the mail." (Id. at 18). The kite also informed Defendant Gutzmer that the law library did not contain a Self-Help Litigation Manual Plaintiff required. (Id. at 19).

On December 5, 2014, Defendant Gutzmer notified Plaintiff that the book he requested was in the facility, and it would be provided to Plaintiff; and he further informed Plaintiff that he was referring his kite regarding "internet-generated" mailings to the Plaintiff's case manager. (Id. at 19). On December 8, 2014, Plaintiff's case manager denied Plaintiff's request. (Id. at 19–20).

On December 11, 2014, Plaintiff wrote Oak Park Heights Warden Grandlienard requesting to be released early from disciplinary segregation so he could obtain a Paralegal Certification via a correspondence course. (Id. at 18). That request was denied. At that time, Plaintiff hypothesized that William Riley was conspiring with his Minnesota Department of Corrections "counterparts" to harass Plaintiff. (Id. at 20).

Sometime in December 2014, Plaintiff drafted a letter to ACU Sergeant Glenn Lisowy (Sgt. Lisowy) informing him of the alleged contamination harassment, as well as, why Plaintiff believed he was being harassed. (Id. at 21). Plaintiff sent this letter to a friend of his outside of prison to have it typed and emailed to various prison staff, including Sgt. Lisowy and Defendant Gutzmer; however, the friend was unable to find email address for the staff, so he sent the letter only to the Warden. (Id.).

4

On December 21, 2014, and December 25, 2014, Plaintiff sent a kite to Health Services requesting a sick call and to be tested for toxic chemicals in his blood. (Id. at 21).

On December 25, 2014, and again on December 26, 2014, Plaintiff alleges that Officer Shields provided Plaintiff with breakfast that had the same chemical odor which Plaintiff again noted on his blanket on December 27, 2014. On December 26, 2014, Plaintiff initiated a grievance procedure against Officer Shields, and on December 27, 2014, Plaintiff initiated a grievance process against Officer Hatch. (Id. at 21–22, 25).

On December 28, 2014, Plaintiff sent Defendant Gutzmer a kite requesting the name of the Officer of the Day for the previous two days, and on December 29, 2014, Defendant responded with the information. (Id.). Defendant Gutzmer also inquired whether Plaintiff had asked the kitchen about the contaminated food, and Plaintiff responded that he had not because he thought it was being contaminated by guards not the kitchen staff. (Id. at 25–26). Plaintiff told Defendant Gutzmer the Federal Bureau of Investigation had used such a tactic against the Black Panthers. (Id.). Defendant Gutzmer allegedly responded by asking Plaintiff what he thought made him "so special that my staff would do this to you?" (Id.). Plaintiff explained his history with the various departments of corrections, his article writing, and his suspicion that William Riley, the Washington Department of Corrections STG Coordinator, was tracking Plaintiff. (Id. at 26–27). Defendant Gutzmer allegedly conceded that Mr. Riley was somehow connected to the MNDOC's investigation office, but inquired as to why Plaintiff thought the staff would harass Plaintiff. (Id.). Defendant Gutzmer also explained to Plaintiff how the blankets were received into the facility and how the food was handled. (Id. at 26). Plaintiff informed Defendant Gutzmer that he just wanted the harassment to stop and that he didn't want to sue the prison. (Id.). Defendant Gutzmer asked why the Warden was getting emails threatening suit, and Plaintiff

explained it was probably just the previous open letter he had written and not a threat of suit. (<u>Id.</u> at 27–28).

On December 30, 2014, Plaintiff was seen by Nurse Teresa Kincannon regarding his request for toxicology screening. (<u>Id.</u> at 28). Nurse Kincannon explained that it was likely heartburn, and told Plaintiff he was not poisoned. (<u>Id.</u>). Plaintiff insisted that he was poisoned, and he continued to request toxicology screening. Nurse Kincannon said she would write it done, but she told Plaintiff "you're not gonna get them." (<u>Id.</u>). Sgt. Lisowy was present during the medical appointment. (<u>Id.</u>). Over the next few days, Sgt. Lisowy talked to Plaintiff about his concerns, told Plaintiff he was paranoid, and obtained a copy of the open letter Plaintiff had written. (<u>Id.</u> at 29). Sgt. Lisowy attached the letter to an incident report, and he allegedly told Plaintiff that if his claims were not substantiated he would write a disciplinary report on Plaintiff. (<u>Id.</u> at 30). Sgt. Lisowy returned again, and in an allegedly belligerent manner, informed Plaintiff that he was "standing up for his staff." (<u>Id.</u>).

Defendant Gutzmer also came to Plaintiff's cell with a copy of the open letter to discuss Plaintiff's complaints about the chemical smell. (<u>Id.</u>). Defendant Gutzmer informed Plaintiff that he had reviewed the video of the search in which Plaintiff alleged the smell was dispersed, and the video showed no misconduct by the staff. (<u>Id.</u> at 31). Plaintiff asked if the video showed the staff searching the head of the bed to which Defendant responded it did not show them "messing with the head of plaintiff's bed at all." (<u>Id.</u>). Plaintiff asked why they wouldn't search there, and Defendant said they had searched there but it showed no indication of contamination. Defendant Gutzmer also noted that while there were blind spots in the video there was no evidence that anyone was poisoning Plaintiff's food. (<u>Id.</u>).

6

On December 26, 2014, Plaintiff sent a kite to Sgt. Lisowy outlining Officer Shields' misconduct because Officer Shields had not responded to an informal kite Plaintiff had sent her. (Id.).

On January 1, 2015, Officer John Ricci along with Officer Shields provided Plaintiff with breakfast which was allegedly tainted with "a noxious chemical odor," and Officer Ricci later walked by Plaintiff's cell to ask: "So, how was your breakfast?" (Id. at 31–32). On January 2, 2015, Plaintiff initiated a grievance procedure against Officer Ricci. (Id. at 32).

On January 5, 2015, Sgt. Lisowy came to Plaintiff's cell to move him to a quieter cell so he could speak with metal health staff, and Sgt. Lisowy informed Plaintiff that he was being moved on Sgt. Lisowy's order. (Id.). However, while Plaintiff was being moved, Sgt. Lisowy allegedly told Plaintiff that he was being moved because Plaintiff's cell neighbor made previous allegations similar to those made by Plaintiff. (Id. 32–33). Shortly after arriving at his new cell, Plaintiff allegedly began to smell human feces. (Id. at 33).

On January 6, 2015, Plaintiff initiated a grievance procedure against Sgt. Lisowy for allegedly threatening to discipline him in retaliation for making complaints against his staff. (Id.). Plaintiff also sent Sgt. Lisowy an informal resolution kite regarding Officer Hatch because Hatch had not responded to a kite Plaintiff sent to him, as well as, a kite about Sgt. Lenz not responding to a kite regarding Officer Shields' conduct. (Id.).

On January 8, 2015, Plaintiff sent Aaron Johnson an informal resolution kite regarding Ricci's conduct because Ricci had failed to respond to the kite sent to him. (Id.). When Sgt. Lisowy failed to respond to all of the informal resolution kits, Plaintiff sent Defendant Gutzmer a kite documenting Sgt. Lisowy's failures on January 11, 2015, and January 13, 2015. (Id. at 33–34).

On January 14, 2015, Defendant Gutzmer allegedly woke Plaintiff in his cell, and he told Plaintiff "that he wasn't happy; that the reason staff weren't responding to plaintiff's informal resolutions kites is because HE had them all; that he didn't know what plaintiff was trying to do, but that plaintiff even had people calling the prison on plaintiff's behalf; and that **plaintiff could continue to pursue his make-believe allegations until HE could get plaintiff transferred back to Washington State.**" (Id. at 34) (emphasis in original). Plaintiff maintained that his allegations were true to which Defendant Gutzmer allegedly responded "grow up and be a man." (Id. at 35). The following day on January 15, 2015, Plaintiff initiated a grievance process against Defendant Gutzmer alleging that Defendant threatened to transfer Plaintiff in retaliation for his filing of kites. (Id. at 35).

After Defendant and Sgt. Lisowy failed to respond in writing to the kites, Plaintiff, on January 19, 2015, sent kites to Captain Steven Ayers. (Id. at 36). On January 20, 2016, Plaintiff received a response informing him that Captain Ayers was aware of the situation, including Defendant Gutzmer coming to Plaintiff's room, and that there was no evidence to support Plaintiff's claims. (Id. at 36–37). Captain Ayer further told Plaintiff that "yes you are an interstate offender so you are here at the pleasure of the warden. We can end that at anytime. What [Defendant] told you is correct and real." (Id. at 37). Captain Ayer also instructed Plaintiff to consider his response to be on behalf of Defendant and his staff.[4]

On January 21, 2015, Plaintiff sent a kite to Captain Ayer regarding Officer Ricci's and Officer Shields' previous behavior; however, Captain Ayer did not respond to either kite. (Id.).

---

[4] Captain Ayer also returned the kites Plaintiff had sent to Sgt. Lisowy and Defendant Gutzmer, and Captain Ayer had written on them that no response was needed, that Plaintiff's allegations were false and misleading, and that while Captain Ayer was not sure what Plaintiff's "game" was he should "stop blaming [Captain Ayer's] staff for whatever [Plaintiff] experienced in Washington." (Id. at 37).

After no response was received, Plaintiff sent the same informal kite, as well as, the previous kites he had sent to Captain Ayer, to Associate Warden of Operation David Reishus. (Id. at 38).

On January 27, 2015, Captain Ayers responded to Plaintiff's kites writing that "Lt. Gutzmer's response stands as to all of your allegations that staff are serving you tampered or spoiled food. I have attached all your previous kites to this one response." (Id. at 38–39). On January 28, 2015, Plaintiff sent Associate Warden Reishus another kite and attached the previous responses he had received. (Id. at 39). Associate Warden Reishus allegedly failed to respond to the informal kites he received, and Plaintiff forwarded those kites to Warden Kent Grandlienard on February 2, 2015. (Id. at 39–40).

On February 3, 2015, Plaintiff received responses to the kites he had sent Associate Warden Reishus, however, those responses were allegedly written by Defendant Gutzmer and Captain Ayers on Associate Warden Reishus' behalf. (Id. at 40). Each response again claimed that Plaintiff's allegations were unfounded. (Id.).

Plaintiff sent Warden Grandlienard several more kites informing him of the lack of responses Plaintiff had received, outlining the history of kites sent, noting that some of his kites seemed to have disappeared, asking him to investigate, and asking the Warden to preserve all relevant evidence. (Id. at 40–41).

On February 5, 2015, Warden Grandlienard responded to Plaintiff that he should ask Captain Ayer about any missing documents.  Warden Grandlienard further wrote that he was "not aware of any of [Plaintiff's] allegations or believe they are valid." (Id. at 42). The Warden noted that "[b]ased on the fact that you are in our ACU (segregation) you are clearly not meeting one of the goals and purposes of the Interstate Compact," which is "giving offenders a 'fresh start' in another state where they can be involved in positive programming in general population

something you are not doing in MN. We are not demanding that you be returned to Wash. St., so your information on that is wrong however, if Wash. St. chooses to send you to another state that is their decision, not ours. I say all this as the former (ICC) Interstate Coordinator for the MN-DOC, so I do know the 'rules.'" (Id.) (underlining in original).

Also on February 5, 2015, Plaintiff sent Captain Ayers a kite inquiring about the previous kite Plaintiff had sent him regarding the allegations of retaliatory transfer, and Captain Ayer responded that Defendant Gutzmer was "correct we are seeking a transfer to another prison with [sic] your home state. This is not a threat—it is the reality. You are here at the pleasure of the warden and you are not appropriate for this facility." (Id. at 43). The response further instructed Plaintiff that any issues he had with other officers should be directed to Defendant Gutzmer. (Exhibit NNN, [Docket No. 1-3], at 30).

At some point in early February, Plaintiff's friend, Laurance Kisinger, emailed on open letter to Governor Mark Drayton, as well as, various other individuals and entities, to "shed light on plaintiff's plight and garner support for plaintiff." (Compl., [Docket No. 1], at 43).

Throughout early February, Plaintiff sent several other kites to Warden Grandlienard, Captain Ayers, and the Grievance Coordinator, Shelli Monio. (Id. at 43–49). In response to those kites the responding official informed Plaintiff that his allegations had been investigated and found to be unsubstantiated, and the responses informed Plaintiff that prison officials could not discuss the particulars of interstate transfer with inmates. (Id.).

On February 18, 2015, Plaintiff sent Defendant Gutzmer a kite regarding Defendant's alleged involvement in a conspiracy to transfer Plaintiff in retaliation for his use of the grievance process against officers. (Id. at 49). In his response to that kite, Defendant Gutzmer acknowledged that he made the statement regarding transfer and that it was regarding transfer;

however, Defendant explained that the statement "was merely a statement of opinion or remedy to end your delusional belief that we somehow show <u>any</u> special attention to you or your case. Why you think any of my staff would throw a career away on you is mind-boggling at best." (Exhibit MM, [Docket No. 1-2], at 21). Defendant further instructed Plaintiff to "do [his] time and play [his] games somewhere else" because Defendant had "better things to do than respond to [Plaintiff's] games" since Defendant had "a 60 bed unit to see to." (<u>Id.</u> at 22). Defendant Gutzmer also wrote "BTW-I have zero say in where you are housed or in which facility, but thank you for thinking that I have the authority to, or the ability to conspire against you! It just shows that you either need help with you mental well-being or are just that bored." (<u>Id.</u>). Defendant Gutzmer concluded by encouraging Plaintiff to "[d]o [his] time wisely." (<u>Id.</u>).

On February 19, 2015, Officers Hobbs and Oye conducted a search of Plaintiff's cell, and allegedly during that search "smeared a white malodorant under plaintiff's desk" and on his legal supplies. (<u>Id.</u>). Plaintiff collected a sample of the substance, and he sent it to an attorney with "Minnesota's ACLU." (<u>Id.</u>).

On February 22, 2015, Plaintiff sent Captain Ayers a kite regarding Defendant Gutzmer's involvement in the alleged conspiracy to transfer Plaintiff. (<u>Id.</u> at 50). Captain Ayer responded that there was no conspiracy to transfer Plaintiff, and that Captain Ayer "had been open with [Plaintiff] that we are working on this very thing." (<u>Id.</u>). Unsatisfied with this response, Plaintiff sent Associate Warden Reishus a kite regarding Defendant's involvement in an alleged conspiracy to transfer Plaintiff. (<u>Id.</u>). Associate Warden Reishus responded that "MN voluntarily accepted in order to provide you with an opportunity to reside safely in a general population unit. Since you have had difficulty doing that, the DOC is no longer willing to keep you in a MN DOC facility." (<u>Id.</u>).

On February 24, 2015, Grievance Coordinator Monio returned the remainder of Plaintiff's previous kites without response claiming that the proper paperwork was not attached and some of the kites were against officers who were not mentioned in the kite itself. (Id. at 50–51).

On February 27, 2015, Plaintiff was transferred from MCF-OPH's ACU to MCF-OPH's Complex 5 (segregation unit), where plaintiff was allowed to recreate with two other prisoners." (Id. at 51). On March 1, 2015, Plaintiff resubmitted his grievances against Sgt. Lisowy and Officer Shields. (Id.).

On March 2, 2015, Plaintiff was transferred to the segregation unit of Complex 1 where he was allowed recreation with other prisoners and physical access to correctional staff. On March 3, 2015, Plaintiff met with Associate Warden Reishus at which time Plaintiff offered to drop all grievances and forgo any legal action, if Plaintiff were allowed "a fair shake" and not transferred back to Washington State. (Id. at 52). Associate Warden Reishus responded that Plaintiff had a history of causing significant trouble, that it was too late to reverse the transfer process, and that Plaintiff should send him a kite if he had any concerns. (Id.). On March 3, 2015, Plaintiff sent Associate Warden Reishus a kite summarizing their previous conversation and asking him to investigate the matter. (Id.). On March 5, 2015, Plaintiff sent the Warden a kite regarding Defendant Gutzmer's involvement in an alleged conspiracy to transfer Plaintiff and summarizing Plaintiff's conversation with Associate Warden Reishus. (Id.).

On March 5, 2015, Plaintiff was moved from segregation status to general population status. (Id. at 52–53). Plaintiff sent additional kites to the Officer of the Day repeating his previous allegations, however, Defendant Gutzmer responded to those kites informing Plaintiff that the videos had been viewed, that his allegations were unfounded, and to stop the false

12

accusations. (Id. at 53–54). On March 9, 2015, Grievance Coordinator Monio returned Plaintiff's most recent kites claiming that the kites were unclear and informing Plaintiff that he can only submit one issue per kite. (Id. at 54–55). Plaintiff sent several more kites to various officials offering to withdraw all grievances if he would not be transferred. (Id.). In a conversation between Plaintiff and Associate Warden Reishus, Associate Warden Reishus told Plaintiff that he was not being transferred for retaliatory reasons. (Id. at 55).

On March 26, 2015, Plaintiff was transferred back to Washington State, and he was "housed in the Intensive Management Unit (IMU: solitary confinement) at the Monroe Correctional Complex (MCC) in Monroe, Washington." (Id. at 56) (underlining in original). Plaintiff alleges that this was a mental health unit where he was forced to undergo mental health treatment. (Id. at 57). On January 13, 2016, Plaintiff was transferred to general population. (Id.).

On December 19, 2016, Plaintiff filed the present Complaint, [Docket No. 1], asserting the factual allegations as outlined above. Defendant Jeff Gutzmer is named as the sole Defendant in the Complaint, and he is sued in both his official and individual capacity. (Id. at 59). Plaintiff's Complaint does not allege any specific causes of action. (See, Compl. [Docket No. 1]). Plaintiff requests as relief that the Court enter declaratory relief that Defendant conspired with other officials to violate Plaintiff's First Amendment rights and that Defendant did so by effectuating Plaintiff's retaliatory transfer; compensatory damages in the amount of $100,000.00; punitive damages; nominal damages; a permanent injunction enjoining Defendant "to expunge all fabricated and/or otherwise false information from plaintiff's base/central file re the official reasons for plaintiff's transfer." (Id. at 61–62).

Construing Plaintiff's pro se Complaint liberally, it appears that Plaintiff alleges two claims pursuant to 42 U.S.C. § 1983. Those claims can reasonably be inferred to be one count of

13

retaliatory transfer and one count of civil conspiracy both allegedly violating Plaintiff's First Amendment rights and both related to Plaintiff's transfer back to the Washington State Department of Corrections.

## II.    DEFENDANT'S MOTION TO DISMISS. [DOCKET NO. 12].

Defendant moves this Court for an Order dismissing Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) reasoning that Plaintiff has failed to state a claim upon which relief may be granted. (Def.'s Mem., [Docket No. 13], at 1). In support of his motion, Defendant asserts that Plaintiff has "failed to allege sufficient personal involvement by" Defendant, and that even if sufficient personal involvement was alleged, Plaintiff has still failed to allege facts supporting a claim upon which relief may be granted. (Id.).

For the following reasons, the Court recommends that the Defendant's Motion to Dismiss, [Docket No. 12], be **GRANTED**.

### A.  Standard of Review

#### 1.  Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998). "The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception." Id. (internal quotations and citations omitted). To invoke federal question jurisdiction, a plaintiff must plead a cause of action arising under federal law or the Constitution. 28 U.S.C. § 1331. A complaint states a federal cause of action when it appears on the face of a well-pleaded complaint. Oglala Sioux Tribe v. C&W Enterp., Inc., 487 F.3d 1129, 1131 (8th Cir. 2007) (citation omitted).

"A court does not obtain subject-matter jurisdiction just because a plaintiff raises a federal question in his or her complaint. If the asserted basis of federal jurisdiction is patently meritless, then dismissal for lack of jurisdiction is appropriate." Biscanin v. Merrill Lynch & Co., Inc., 407 F.3d 905, 907 (8th Cir. 2005) (internal citations omitted) (citing Hagans v. Lavin, 415 U.S. 528, 537–38 (1974)). In other words, merely because a plaintiff states in the complaint that the Court has subject matter jurisdiction does not make it so. It is the burden of the party asserting jurisdiction to prove that jurisdiction exists. VS Ltd. P'ship. v. Department of Hous. & Urban Dev., 235 F.3d 1109, 112 (8th Cir. 2000).

"A court must dismiss an action over which it lacks subject matter jurisdiction." Pomerenke v. Bird, No. 12-cv-1757 (DSD/JJG), 2014 WL 30363, at *1 (D. Minn. Jan. 3, 2014) (citing Fed. R. Civ. P. 12(h)(3)). Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a party may move to dismiss a pleading for lack of subject matter jurisdiction.

While the Court is required to construe the content with Plaintiff's pleadings liberally as he is proceeding *pro se*, Plaintiff is nevertheless bound by applicable procedural and substantive law. See, Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004). "Although pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law." Burgs v. Sissel, 745 F.2d 526, 528 (8th Cir. 1984).

### 2.  Failure to State a Claim

When evaluating a motion to dismiss under Rule 12(b)(6), courts "look only to the facts alleged in the complaint and construe those facts in the light most favorable to the plaintiff." Riley v. St. Louis Cty. of Mo., 153 F.3d 627, 629 (8th Cir. 1998) (citing Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 556 (8th Cir 1998)), cert. denied 525 U.S. 1178 (1999). Courts must accept as true all of the factual allegations in the complaint and draw all

reasonable inferences in the plaintiff's favor. Aten v. Scottsdale Ins. Co., 511 F. 3d 818, 820 (8th Cir. 2008). Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level," which "requires more than labels and conclusions, and a formulistic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

The complaint must "state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556–57). When courts undertake the "context-specific task" of determining whether a plaintiff's allegations "nudge" its claims against a defendant "across the line from conceivable to plausible," they may disregard legal conclusions that are couched as factual allegations. See, Iqbal, 556 U.S. at 678–81.

Generally, in evaluating a complaint, materials outside the pleadings cannot be considered on a motion to dismiss. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999). However, a court "may consider the pleadings themselves, material embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." Mills v. City of Grand Forks, 614 F.3d 495, 498 (8th Cir. 2010) (citing Porous Media Corp., 186 F.3d at 1079).

While the Court is required to construe the content with Plaintiff's pleadings liberally as he is proceeding *pro se*, Plaintiff is nevertheless bound by applicable procedural and substantive law. See, Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004).

### B.  Analysis

To state a claim upon which relief may be granted pursuant to 42 U.S.C. § 1983, "a plaintiff must [allege] (1) violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right." McDonald v. City of Saint Paul, 679 F.3d 698, 704 (8th Cir. 2012) (quoting Shrum ex rel Kelly v. Kluck, 249 F.3d 773, 777 (8th Cir. 2001) (citations omitted)). A plaintiff must plead facts sufficient to demonstrate that an individual defendant was *directly* and *personally* involved in an alleged *constitutional violation*. Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985); Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights.").[5]

### 1.  Official Capacity Monetary Damages Claims

As a threshold subject matter jurisdictional consideration, the Eleventh Amendment prohibits an action for monetary damages against a state unless it has unequivocally consented to suit or Congress has abrogated the states' immunity for a particular federal cause of action. Hadley v. North Arkansas Community Technical College, 76 F.3d 1437, 1438 (8th Cir. 1996); Faibish v. University of Minnesota, 304 F.3d 797, 200 (8th Cir. 2002). States are entitled to Eleventh Amendment immunity from federal claims brought under Section 1983. Hadley, 76 F.3d at 1438 ("Section 1983 does not override Eleventh Amendment immunity."). If claims are prohibited by Eleventh Amendment immunity, that immunity prohibition deprives the Court of subject matter jurisdiction, and under such circumstances, dismissal pursuant to Federal Rule of

---

[5] Claims premised on a theory of vicarious liability do *not* state a claim for relief pursuant to 42 U.S.C. § 1983, Beard v. Lockhart, 716 F.2d 544, 545 (8th Cir. 1983), as the doctrine of *respondeat superior* does not apply in Section 1983 actions. Monell v. Dep't of Soc. Servs., 436 U.S. 659, 691 (1978).

Civil Procedure 12(b)(1) is appropriate. See, Daniels v. Jesson, No. 13-cv-736, (JNE/SER), 2014 WL 3629874, at *5 (D. Minn. July 22, 2014); Semler v. Ludeman, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *7 (D. Minn. Jan 8, 2010).

The immunity afforded a state in federal court extends to agencies of the state. Minnesota Pharmacists Ass'n v. Pawlenty, 690 F. Supp. 2d 809, 815 (D. Minn. 2010) (citing Florida Dep't of Health & Rehabilitative Sers. v. Florida Nursing Home Ass'n, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1982)). Similarly, a suit against a state employee in that person's official capacity constitutes a suit against the public employer, namely, the state itself. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999) (citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)); see also, Uland v. City of Winsted, 570 F. Supp. 2d 1114, 1119–20 (D. Minn. 2008) (citing Baker v. Chisom, 501 F.3d 920, 924 (8th Cir. 2007); Bankhead v. Knickrehm, 360 F.3d 839, 844 (8th Cir. 2004)). "The law is clear that, 'the real party in interest in an official capacity suit is the governmental entity and not the named official.'" Semler, 2010 WL 145275, at *6 (citing Baker, 501 F.3d at 925). "It is well-settled that in a 42 U.S.C. § 1983 action, the Eleventh Amendment precluded an award of money damages against a state official acting in his or her official capacity. A plaintiff may maintain an action against a governmental official if the complaint seeks only injunctive or prospective relief." Semler, 2010 WL 145275, at *7 (citations omitted). The government and its officials are also immune from punitive damages under § 1983 because "considerations of history and policy do not support exposing a [state] to punitive damages for the bad-faith actions of its officials." See, City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981).

As an employee of the Minnesota Department of Corrections, Defendant Gutzmer in the present case is a state official. See, Semler, 2010 WL 145275, at *7; Daniels, 2014 WL 3629874,

at *5. The Court, therefore, necessarily must construe Plaintiff's alleged Section 1983 official capacity claims against Defendant as being alleged against the employing entity, i.e., the State of Minnesota.

Even liberally construing Plaintiff's Complaint and drawing all reasonable inferences in his favor, the present record before the Court is still devoid of any evidence or legal authority demonstrating either the state's consent to suit or Congressional abrogation of the state's sovereign immunity.

Plaintiff will not be able to recover monetary relief (whether compensatory or punitive in nature) from Defendant based on any of the claims alleged against him in his official capacity. Therefore, the Court recommends that all of Plaintiff's Section 1983 claims, so far as they seek monetary damages as alleged against Defendant Gutzmer sued in his official capacity, be **DISMISSED with prejudice** for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). See, Semler, 2010 WL 145275, at *7 ("[T]o the extent that Plaintiffs seeks monetary damages for actions taken by Defendants in their official capacities, these claims against Defendants are barred by the Eleventh Amendment[.]").

By contrast, "suits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law." Fond du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253, 255 (8th Cir. 1995) (citing Ex Parte Young, 209 U.S. 123 (1908)). Dismissing Plaintiff's claims for monetary damages against Defendant in his official capacity leaves Plaintiff's official capacity claims for declaratory relief, as well as, his official capacity claims for injunctive relief and his individual capacity claims for monetary damages and injunctive relief for the Court's further consideration below.

### 2. Declaratory Relief

In his Complaint, Plaintiff requests

> Declatory [sic] relief/judgment that Defendant Gutzmer conspired with one or more of the aforementioned officials/people to violate plaintiff's protected First Amendment right to file good faith complaints/grievances against the aforementioned staff, and that he did so by effectuating plaintiff's transfer in retaliation for his exercise of said rights; or, alternatively, that Defendant Gutzmer violated plaintiff's protected First Amendment right to file good faith grievances/complaints against the aforementioned staff, and that he did so by effectuating plaintiff's transfer in retaliation for plaintiff's exercise of said right.

(Compl., [Docket No. 1], at 61–62). However, "in seeking declaratory relief, 'a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant." Smith v. Roy, No. 10-cv-2193 (JRT/TNL), 2012 WL 1004985, *5 (D. Minn. Jan. 25, 2012), report and recommendation adopted by Smith v. Fabian, 2012 WL 1004982, *1 (D. Minn. Mar. 26, 2012) (citations omitted). Thus, to the extent that Plaintiff seeks declaratory relief stating that Defendant previously violated his constitutional rights, this Court recommends denying his request.

Therefore, because Plaintiff's request for declaratory judgment seeks only a retrospective opinion that his constitutionally protected rights were violated by Defendant, this Court recommends **DISMISSING without prejudice** Plaintiff's claims to the extent that they seek declaratory relief.

Dismissing Plaintiff's request for retroactive declaratory judgment now leaves only Plaintiff's official capacity claims for injunctive relief and his individual capacity claims for monetary damages and injunctive relief. Thus, the Court now considers to whether Plaintiff has alleged sufficient facts in his Complaint to survive Defendant's Motion to Dismiss under Rule 12(b)(6). If he has not, his remaining claims likewise should be dismissed, regardless of whether he seeks injunctive relief or monetary damages.

20

### 3. Retaliatory transfer claim

In order to sustain a claim of retaliatory transfer, a prisoner must show that the transferring official's desire to punish the prisoner for exercising a constitutional right was <u>the</u> motivating factor behind the transfer. <u>See</u>, <u>Scales v. Davis</u>, 373 Fed. App'x 637 (8th Cir. 2010); <u>Goff v. Burton</u>, 91 F.3d 1188, 1191 (8th Cir. 1996).

Defendant Gutzmer argues that Plaintiff's retaliatory transfer claims fails because Plaintiff has failed to adequately plead Defendant's personal involvement in the alleged unconstitutional actions which Plaintiff alleges. (Def.'s Mem., [Docket No. 13], at 8–11). Plaintiff disagrees, and he recounts, in his Response, the factual allegations he contends adequate support his claim of Defendant's personal involvement. (Plf.'s Response, [Docket No. 25], at 73–77).

Plaintiff's § 1983 retaliatory transfer claim alleges that Defendant Gutzmer violated Plaintiff's constitutional rights when Defendant transferred Plaintiff back to Washington States in retaliation for Plaintiff's filing of grievance complaints. (<u>See</u>, Compl. [Docket No. 1]). "To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." <u>Jackson v. Nixon</u>, 747 F.3d 537, 543 (8th Cir. 2014) (citing <u>Iqbal</u>, 556 U.S. at 676)). Thus, to survive Defendant's current Motion to Dismiss, Plaintiff, in the present case, must have alleged Defendant's personal involvement in the asserted violations with "more than labels and conclusions, and a formulistic recitation of the elements of a cause of action will not do." <u>See</u>, <u>Twombly</u>, 550 U.S. at 555.

In his Complaint, Plaintiff asserts that he sent Defendant Gutzmer various kites, including kites seeking certain information from Defendant, kites complaining that that Plaintiff's food and cell were being tainted with chemicals, kites stating that other officers were placing

"malodorants" on Plaintiff's bed and belongings, kites alleging that other officers were not responding to kites, and kites claiming that Defendant was conspiring to transfer Plaintiff; that Defendant talked personally with Plaintiff regarding transfer at least once; and that Defendant responded in writing to some of the kites. (See, Compl. [Docket No. 1]). However, the Complaint demonstrates that each kite sent to Defendant Gutzmer was either answered by Defendant or one of his superiors. Each response informed Plaintiff that the evidence had been reviewed and his allegations were found unsubstantiated. The kites regarding retaliation specifically informed Plaintiff that he was not being transferred for retaliatory purposes and explained in fact why he was being transferred.

While Defendant did tell Plaintiff he "**could continue to pursue his make-believe allegations until HE could get plaintiff transferred back to Washington State**," (Compl., [Docket No. 1], at 34) (emphasis in original), the Plaintiff's own submissions show that Defendant later clarified his statement. As noted in Plaintiff's Complaint, and illustrated in the exhibits attached thereto, Defendant explained that his statement "was merely a statement of opinion or remedy to end [Plaintiff's] delusional belief that we somehow show <u>any</u> special attention to you or your case." (Exhibit MM, [Docket No. 1-2], at 21). Defendant also wrote to Plaintiff: "BTW-I have zero say in where you are housed or in which facility, but thank you for thinking that I have the authority to, or the ability to conspire against you! It just shows that you either need help with you mental well-being or are just that bored." (<u>Id.</u> at 22). Nothing in Defendant's statement as alleged in Plaintiff's Complaint demonstrates that Defendant Gutzmer was actually involved in Plaintiff's transfer back to Washington State or the decision to transfer Plaintiff.

As also noted above, to state a claim of retaliatory transfer, Plaintiff, in the present case, must also show that Defendant's alleged desire to punish Defendant for filing grievances was the motivating factor behind Defendant's decision to transfer Plaintiff. See, gen., Scales v. Davis, 373 Fed. App'x 637 (8th Cir. 2010). Although Plaintiff conclusorily asserts that Defendant "exert[ed] undue influence upon Captain Ayers, A/W/O Reishus, Warden Grandlienard, the Interstate Transfer Coordinator, Ms. Sherlinda Wheeler, and" other various John Does "in order to intentionally effectuate plaintiff's transfer," there are no actual factual allegations in the record of such influence supporting such a conclusion. (See, Compl., [Docket No. 1], at 59). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. "A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." Iqbal, 556 U.S. at 664.

Plaintiff's mere assertion that Defendant exerted some sort of generic undue influence upon his superiors and others thereby making Defendant the de facto decision maker concerning Plaintiff's transfer is such a conclusion, and as such, it does not satisfy Iqbal or Twombly. See, Barton v. Taber, 820 F.3d 958, 963–64 (8th Cir. 2016) (accepting facts but not mere legal conclusions alleged in the complaint as true for purposes of a Rule 12(b)(6) motion; Hager v. Arkansas Dept. of Health, 735 F.3d 1009, 1014–15 (8th Cir. 2013) (finding plaintiff had not stated a § 1983 claim for gender discrimination because her allegation that she was discharged under circumstances in which men were not was a legal conclusion couched as a factual allegation, which need not be accepted as true under Twombly); Walker v. Barrett, 650 F.3d

1198, 1209 (8th Cir. 2011) ("[L]egal conclusions, without any supporting factual allegations, are insufficient to survive a motion to dismiss.").

Plaintiff, citing Fernandez v. North Dakota, 2014 U.S. Dist. LEXIS 179616 (Nov. 3, 2014), argues that the fact that Defendant "did not have the authority to transfer [Plaintiff] is irrelevant" because the decision was a collective one, and Fernandez, Plaintiff asserts, found that "while the warden may have made the final decision to transfer" the plaintiff, dismissal of the complaint was not required because "there was evidence that it was a collective one or even dictated by another prison official." (Plf.'s Response, [Docket No. 25], at 77). However, in addition to its non-controlling nature, Fernandez is also factually distinguishable from the present case, and Plaintiff reliance upon it is misplaced.

In Fernandez, the record contained evidence of direct recommendations by defendants to the warden encouraging the prisoner's transfer. The Court specifically relied upon those recommendation, as well as, a memorandum to the warden from the deputy warden which stated that he 'would like to send [plaintiff] back to Nevada and tell them that we cannot handle this inmate," in deciding that the decision to transfer may have been a collective one. Fernandez v. North Dakota, No. 1:12-cv-161, 2014 WL 7409550, at *4 (D.N.D. Nov. 3, 2014), subsequently aff'd, 612 Fed. App'x 407 (8th Cir. 2015). The Court specifically referenced not only the memorandum to the warden recommending the prisoner be transferred but also specific conversations the deputy warden had with the warden where the deputy warden recommended transferring the prisoner and a memorandum to the prisoner's original state instructing them to make arrangement to take the prisoner back due to the problems the prisoner was causing. Id. at *11. There are no similar factual allegations in the present case even remotely resembling the evidence upon which the court relied in Fernandez.

In the present case, even liberally construing Plaintiff's pro se Complaint, taking all the facts pled within as true, and drawing all reasonable inferences in Plaintiff's favor, nothing alleged in the Complaint is sufficient to meet the § 1983 requirement that Plaintiff plead sufficient facts to plausibly show both Defendant's personal involvement in the decision to transfer Plaintiff back to Washington State or that Defendant's alleged desire to punish Plaintiff for alleged constitutionally protected activities was the motivating factor behind the decision to transfer Plaintiff.

Therefore, the Court recommends **DISMISSING without prejudice** Plaintiff's claim of retaliatory transfer, regardless of the specific relief sought, for failure to state a claim upon which relief may be granted.

### 4. Civil Conspiracy Claim

To prove a § 1983 conspiracy claim, Plaintiff must show that Defendant (1) conspired with others to deprive Plaintiff of a constitutional right; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured the plaintiff. Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999). Like all § 1983 actions, Plaintiff must also demonstrate that Defendant was personally involved. See, Jackson v. Nixon, 747 F.3d 537,543 (8th Cir. 2014).

In the present case, Plaintiff fails on the first element. Nothing in the Complaint, or the exhibits attached thereto, provides a factual basis upon which a reasonable inference can be made that Defendant conspired with others to deprive Plaintiff of any constitutional right. There is nothing in the materials now before the Court that even indicated that Defendant spoke to any of the other persons mentioned in the Complaint regarding the decision to transfer Plaintiff. There are no factual assertions that Defendant made any agreement with anyone much less

entered into a conspiracy with others to transfer Plaintiff. Accordingly, Plaintiff has failed to show that Defendant conspired with others to deprive Plaintiff of a constitutional right. See, Hegler v. Fowler, 828 F.3d 755, 763 (8th Cir. 2016) (finding that plaintiff's "conspiracy claim fails because he has not presented evidence of an agreement between Defendants to deprive him of a" constitutional right); Reasonover v. St. Louis Cty., Mo., 447 F.3d 569, 582 (8th Cir. 2006) (finding that a conspiracy claim failed where plaintiff presented "no specific material facts, circumstantial or otherwise, that the officers formed an agreement to violate [plaintiff's] constitutional rights").

Although Plaintiff asserts in his Complaint that "[u]pon information and belief, Defendant Gutzmer conspired with Captain Ayers, A/W/O Reishus, Warden Grandlienard, the Interstates Transfer Coordinator, Sherlinda Wheeler, and" various John Does "to transfer plaintiff" back to Washington State "in retaliation for" Plaintiff's filing of grievances, there are no specific factual allegations in the Complaint, or the exhibits attached thereto, to substantiate that mere legal conclusion. (See, Compl. [Docket No. 1]). As noted above, however, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555; see, also, Barton, 820 F.3d at 963–64 (accepting facts but not mere legal conclusions alleged in the complaint as true for purposes of a Rule 12(b)(6) motion); Hager, 735 F.3d at 1014–15 (finding plaintiff had not stated a § 1983 claim for gender discrimination because her allegation that she was discharged under circumstances in which men were not was a legal conclusion couched as a factual allegation, which need not be accepted as true under Twombly); Walker, 650 F.3d at 1209 ("[L]egal conclusions, without any supporting factual allegations, are insufficient to survive a motion to dismiss.").

In the present case, even liberally construing Plaintiff's pro se Complaint, taking all the facts pled within as true, and drawing all reasonable inference in Plaintiff's favor, nothing in the Complaint is sufficient to meet the § 1983 requirement that Plaintiff allege sufficient facts to plausibly plead Defendant's personal involvement in any alleged conspiracy with others to transfer Plaintiff in violation of Plaintiff's alleged constitutional rights.

Therefore, the Court recommends **DISMISSING without prejudice** Plaintiff's claim of conspiracy, regardless of the specific relief sought, for failure to state a claim upon which relief may be granted.

## V.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Dismiss, [Docket No. 12], be **GRANTED;**

2. Plaintiff's § 1983 claims for monetary and punitive damages against Defendants in his official capacity be **DISMISSED with prejudice;**

3. Plaintiff's § 1983 claims for monetary and punitive damages against Defendants in his individual capacity be **DISMISSED without prejudice;**

4. Plaintiff's § 1983 claims for injunctive and declaratory relief against Defendants in his official or individual capacities be **DISMISSED without prejudice**; and

5. Plaintiff's Complaint, [Docket No. 1], be **DISMISSED**.

Dated: January 23, 2018                                    s/Leo I. Brisbois
                                                       The Honorable Leo I. Brisbois
                                                       United States Magistrate Judge

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).